Joseph L. ALIOTO, Plaintiff,

v.

COWLES COMMUNICATIONS, INC., Defendant.

Civ. No. 52150-WWS.

United States District Court, N. D. California.

May 3, 1977.

Lawrence Alioto, Law Offices of Joseph L. Alioto, San Francisco, Cal., for plaintiff.

Charles Kenady, Cooper, White & Cooper, San Francisco, Cal., for defendant.

MEMORANDUM OF OPINION,
FINDINGS OF FACT AND
CONCLUSIONS OF LAW

SCHWARZER, District Judge.

This is an action for libel in which plaintiff seeks damages for defamatory statements contained in an article published by defendant's Look Magazine in September, 1969, while plaintiff served as Mayor of San Francisco. This Court has jurisdiction under 28 U.S.C. § 1332(a).

The prior history of this litigation is summarized in the opinion of the Court of Appeals in *Alioto v. Cowles Communications, Inc.*, 519 F.2d 777 (C.A. 9, 1975). The first trial ended in a hung jury. At the second trial the jury returned a special verdict finding the article false in one or more particulars and defamatory, but reached no agreement on the issue of actual malice. The trial judge granted defendant's motion for judgment n.o.v., but the Court of Appeals reversed and remanded "for a new trial on the sole issue of actual malice." The third trial which followed again ended in a hung jury. The action came on for a fourth trial before this Court commencing March 21, 1977, both parties having waived the jury.

The Court, after considering all of the evidence and the arguments of counsel, finds and concludes, for the reasons hereafter discussed, that plaintiff has sustained the burden of proving by clear and convincing evidence that defendant published the defamatory statements contained in the article with actual malice, that is, with reckless disregard for whether they were true or not, and is entitled to judgment in the sum of $350,000.00, plus costs.

I.

■ Inasmuch as plaintiff was a public official when the article was published, this case is controlled by the rule of *New York Times Co. v. Sullivan*, 376 U.S. 254, 280–281, 84 S.Ct. 710, 11 L.Ed.2d 686, 726 (1963), which

"prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not."

In *Garrison v. Louisiana*, 379 U.S. 64, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964), the Court explained that this rule

"protects the paramount public interest in a free flow of information to the people concerning public officials, their servants. To this end, *anything which might touch on an official's fitness for office is relevant.*" (379 U.S. at 77, 85 S.Ct. at 217, emphasis added.)

■ Under the *New York Times* rule, evidence of malice must be clear and convincing to satisfy the Constitutional standard under the First Amendment. Evaluation of evidence under this rule confronts the Court with the difficult task of resolving in each case the tension between society's interest in free speech and the individual's interest in his reputation. See, *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 342–343, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974).

■ It is settled that failure to investigate or in other respects to use due care in publishing false statements about public officials does not meet the test. See, *New York Times Co. v. Sullivan*, above, 376 U.S. at 287, 84 S.Ct. 710; *Beckley Newspaper v. Hanks*, 389 U.S. 81, 84–85, 88 S.Ct. 197, 19 L.Ed.2d 248 (1967). Conversely, proof of actual knowledge of falsity is not required. In *St. Amant v. Thompson*, 390 U.S. 727, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968), the Supreme Court elaborated on the *New York Times* rule and provided guidelines which are dispositive of this case. That was an action for libel brought by a deputy sheriff whom defendant had charged with accepting bribes. The Court, in applying the *New York Times* malice standard, said:

" 'Reckless disregard,' it is true, cannot be fully encompassed in one infallible definition. Inevitably its outer limits will be worked out through case-by-case adjudi-

cation . . ." (390 U.S. at 730, 88 S.Ct. at 1325.)

The Court explained that

"reckless conduct is not measured by whether a reasonably prudent man would have published or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication. Publishing with such doubts shows reckless disregard for truth or falsity and demonstrates actual malice." (390 U.S. at 731, 88 S.Ct. at 1325.)

■ The Court's opinion then elaborated on the application of this standard to a defamatory publication:

"The defendant in a defamation action brought by a public official cannot, however, automatically insure a favorable verdict by testifying that he published with a belief that the statements were true. The finder of fact must determine whether the publication was indeed made in good faith. Professions of good faith will be unlikely to prove persuasive, for example, where a story is fabricated by the defendant, is the product of his imagination, or is based wholly on an unverified anonymous telephone call. Nor will they be likely to prevail when the publisher's allegations are so inherently improbable that only a reckless man would have put them in circulation. Likewise, *recklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports*." (390 U.S. at 732, 88 S.Ct. at 1326, emphasis added.)

With these controlling principles in mind, the Court now turns to the evidence of malice in this case.

## II.

■ Under the title "The Web That Links San Francisco's Mayor Alioto and The Mafia", defendant's Look Magazine published an article purporting to be a "report on the private Joseph Alioto and his relationship with organized crime." The article was written by Richard Carlson and Lance Brisson who sold it to Look. According to defendant, the "sting" or theme of the article is reflected in its first and last paragraphs which state:

"Mayor Joseph L. Alioto of San Francisco, the rising politician who came close to the Democratic nomination for the Vice Presidency in 1968, is enmeshed in a web of alliances with at least six leaders of La Cosa Nostra. He has provided them with bank loans, legal services, business counsel and opportunities, and the protective mantle of his respectability. In return, he has earned fees, profits, political support and campaign contributions.

"A lengthy investigation by LOOK reveals that some of these links between Alioto and the underworld go back almost a quarter of a century. They have not been broken.

\* \* \* \* \* \*

"Alioto's law firm, in which he still retains an interest, continues to represent the Marinos and the California Cheese Co. His brother-in-law, Papale, remains in frequent friendly contact with Angelo Marino. The latter talks regularly with Bompensiero, who still sees LaPorte. And so on. Mayor Joseph Alioto's channels of communication with the Cosa Nostra remain open."

Defendant's purpose was to raise questions concerning plaintiff's fitness for public office on the basis of his alleged relationship to organized crime.

The heart of the article—and the subject which provided the impetus for the authors' investigation—was a series of loans made by the First San Francisco Bank in 1965 to one James Fratianno. Plaintiff was a founder and a shareholder of that bank and served as chairman of its board of directors; plaintiff's law firm appears also to have performed some legal services for it. The loans were made in 1965, two years before plaintiff was first elected mayor. It is alleged in the article that Fratianno, described as "the chief executioner for the Mafia on the West Coast", had been involved in various crimes, including rape, extortion,

armed robbery, fraud and bookmaking, over a period of 35 years. Much of the article is devoted to the nefarious activities of Fratianno and his alleged underworld associates.

The common thread of the defamatory matter complained of is represented by the allegations that plaintiff assisted Fratianno in obtaining loans from the First San Francisco Bank with knowledge of Fratianno's "criminality". Their substance is contained in the following paragraphs which include the so-called "Nut Tree meetings" allegations:

"Alioto was then organizing his First San Francisco Bank and seeking out future customers. He had also been thinking of entering politics for the first time. But despite encouragement from fellow Democrats to run for mayor in 1963, he rejected the opportunity because of 'business obligations.'

"Those obligations apparently included a series of nighttime meetings at the Nut Tree, a restaurant along the highway between San Francisco and Sacramento. Among those present at one or more of the conferences, in addition to Alioto, were Fratianno, Bompensiero, Angelo Marino, LaPorte and one of Jimmy Hoffa's top Teamster representatives on the West Coast. Alioto's plan to organize a bank was a subject of intense discussion.

"After one meeting, Fratianno said he was 'excited' about the possibilities for the future because 'my man [Alioto]' would control the bank's board of directors. Fratianno also expressed the belief that he would be able to buy a piece of the bank's stock. Later, after another meeting at the Nut Tree, Fratianno said Alioto was excluding him because of his hoodlum reputation but had assured him he would be able to obtain loans from the bank.

"The First San Francisco Bank opened its doors for business in July, 1964. Fratianno, still hungry for capital, did not forget the promise. Negotiations in San Francisco were arranged.

"On the morning of November 5, 1964, Fratianno and Angelo Marino met with Joseph Alioto at his 111 Sutter St. law offices to discuss Fratianno's finances. Alioto called the bank to set the loan wheels in motion." [1]

The theme of these paragraphs recurs in many variations throughout the text of the article and in the captions of a full page diagram entitled "The Web of Relationships" showing plaintiff's picture in the center of a web connecting him with various persons reputed to be Mafia figures. Thus the article states, inter alia, that Alioto "personally arranged for the loans after several meetings with Fratianno and other Mafia leaders," that he "had to have known of [Fratianno's] criminality", that Alioto had "vouched for "[Fratianno]", that Alioto "made 'at least a dozen' long-distance calls to Fratianno", and that when Fratianno defaulted, "strangely, unlike most of Fratianno's other creditors, Alioto's bank never sued for damages or recovery of the debt."

The general allegation linking plaintiff with the Fratianno loans derived from information received by the authors from a law enforcement source responsible for investigating organized crime in Northern California. That information disclosed that the Fratianno Trucking Company had obtained a series of five loans from the First San Francisco Bank to purchase trucks and related equipment, secured by title to the equipment. Some of the loans were made after a bank officer had learned that Fratianno had a criminal record. In this connection, the authors were also told that Angelo Marino and Fratianno had been observed, shortly before the first loan was made, entering the office building at 111 Sutter Street, where the Alioto law firm had its offices, and may have visited those offices. The authors had no information, however, that plaintiff had met with them. According to their law enforcement

---

1. The previous trials established these so-called Nut Tree meeting allegations to be false and defamatory.

source, a bank officer had stated, concerning plaintiff's role in the making of the loan, that Fratianno "was brought to the bank by 'Joseph Alioto, who is a client of the bank and a well-known attorney'. [The bank officer] also said that . . . while Alioto did not vouch personally for Fratianno's credit he did say 'his credit is considered good by all with whom he has done business.' "

In an attempt to develop the Fratianno loan story, Richard Carlson contacted one Tommy Lee Thomas, who, until 1966, had been Fratianno's son-in-law and business associate. Carlson had seen Thomas' name on loan documents at the First San Francisco Bank and on Public Utilities Commission papers relating to the trucking company. Carlson learned that Thomas had cooperated with the government in a prosecution of Fratianno for underpaying his truck drivers, and had been considered truthful by the agent in charge of that case. Carlson also knew that FBI agents in the Sacramento area had spoken to Thomas from time to time, but made no inquiries regarding Thomas' reputation for reliability. When Carlson met Thomas in Sacramento around July 2, 1969, Thomas requested anonymity before consenting to an interview and was assured that his statements would not be attributed.

In a lengthy interview with Carlson that day, Thomas related conversations he had had five years earlier with Fratianno during which Fratianno had told Thomas of meetings at the Nut Tree restaurant with Alioto and a group of persons, including Frank Bompensiero, Frank LaPorte, Angelo Marino and Jack Goldberger. LaPorte, Bompensiero and Marino are described in the article as major figures in organized crime. They represent three of the six crime figures with which plaintiff, according to the article, is linked in "a web of alliances." This was the only information the authors had received linking Alioto with Bompensiero and LaPorte. Goldberger is an official of the Teamsters Union. The discussion at the meetings, according to Thomas, concerned a bank Alioto was start-

ing which he wanted his friends to help him control. At a later meeting Alioto was said to have told Fratianno he would have to be excluded because of his bad reputation but would be able to borrow money from the bank.

Thomas also claimed to have spoken to Alioto on the telephone at least a dozen times while he was at the trucking company. And he described contacts which Fratianno claimed to have had with various political figures, including an alleged payoff to the Governor of California.

Immediately after the interview Carlson prepared a summary, ten single-spaced pages in length. A day or two later, Martin Goldman, Look's managing editor who was responsible for the article, met with the authors in San Francisco. They discussed the progress of the investigation and the prospects for producing an article for publication. At that point, defendant had advanced some expense money to the authors but had not yet committed itself to purchase the article. It was decided that Carlson would meet Thomas once more and tape record the interview. They met a few days later.

The transcript of the tape recording of the second Thomas interview, and Carlson's recollection of it, reflect that Thomas generally adhered to his previous statements, but with such qualifications as, "I'm just guessing, because it's so long ago. It's pretty hard to remember all that stuff . . . ." Thomas said that he just guessed at the number of Nut Tree meetings and could not fix the time when the meetings took place. When questioned about which persons were present at the meetings, Thomas replied that he didn't think "Bump" (Bompensiero) was at every meeting, "and it would be hard to say about Alioto, I would assume that Alioto was at every meeting, because, what the hell, he was the guy that had something that they wanted."

Following the second Thomas interview, the authors prepared a draft of the article including the substance of the Nut Tree charges and sent it to Goldman near the

end of July. Goldman then met with the authors once more and agreed to purchase the article. Thereafter, in frequent consultation with the authors, he made extensive editorial changes, the general effect of which was to expand and sharpen the tone of the references in the article to Alioto's connections with persons alleged to be known to him as criminals.[2]

The first attempt to corroborate the reports of the Nut Tree meetings was made in early August when Carlson contacted an FBI agent charged with local responsibility for following organized crime activity who had theretofore been his principal source of information for the article. This agent advised that he had no information of any such meetings. Subsequently Lance Brisson, the other author, sought corroboration from an employee of a state law enforcement agency responsible for investigating organized crime activity who had also been an important source for the article; he advised that the report of the meeting was "ridiculous."

Late in August, the authors had a lengthy interview with plaintiff. Although they did not ask him directly about the Nut Tree meetings, they did ask him whether he knew LaPorte or Bompensiero, which plaintiff denied. Plaintiff further described the nature of his relationships with the other alleged underworld figures mentioned in the article. These relationships involved intermittent legal representation of the Marinos, Lanza and Emilio Georgetti, not all of it by Alioto himself. The only relationships of Alioto bearing on the subject of the article, other than through legal representation, were an interest in the Regal Packing Co., which had a business relationship with the Marino's California Cheese Co., and participation a number of years ago in the purchase of the Castlewood Country Club, with which Georgetti had had a connection. Beyond that, plaintiff had relationships with some persons, such as his brother-in-law, who in turn were alleged to have had relationships with organized crime figures, apparently unrelated to plaintiff. With respect to the Fratianno loans, plaintiff explained that he had met Fratianno once when Goldberger brought him to Alioto's Rice Growers Association office and introduced him. Fratianno wanted help in obtaining a contract for the bulk hauling of rice and a bank loan. Plaintiff's only responsive action was to telephone the bank, which was then newly founded and actively looking for borrowers, introduce Fratianno as a prospective borrower and advise the bank officer that any loan to him should be made on the merits.

Following the Alioto interview, Brisson telephoned Goldberger who denied attending meetings with the persons allegedly at the Nut Tree meetings. He indicated reluctance to discuss the matter over the telephone, but offered to meet Brisson at his office and answer questions. Brisson made no attempt to see Goldberger.

The question before the Court is whether the foregoing evidence, in the light of the record as a whole, establishes with convincing clarity that defendant published the article with reckless disregard for its truth or falsity.

## III.

The Nut Tree allegations, together with the related allegations contained in the article of which plaintiff complains, charge plaintiff with having secretly and knowingly connived with notorious criminals to provide them with bank loans for business activities controlled by organized crime.

While Carlson and Brisson prepared the article in draft form, the final version was the product of joint efforts by the authors and Goldman. There is no dispute that the authors fully shared their knowledge and

2. These changes appear on Exhibit 3a in Goldman's handwriting. Goldman testified that they were changes made by mutual agreement with the writers and that the fact they were in his handwriting did not necessarily indicate that he was their author. Whoever may have been the originator of any particular change, however, the volume and substance of the revisions made in his handwriting establish the depth of his involvement in the preparation of the article for publication.

information with Goldman, that he was informed of the sources for the material statements in the article, and that he participated actively and at length in the preparation of the final text. Defendant does not contend that the authors withheld facts from Goldman relevant to the issue of defendant's malice, or that any gap of information existed between them and Goldman. Hence, it is not disputed that the malice issue must be decided on the basis of whether there is clear and convincing evidence that Goldman entertained serious doubts as to the truth of the publication.

Goldman has testified that he believed these allegations and charges to be true but the Court must determine from all of the evidence "whether the publication was indeed made in good faith." *St. Amant v. Thompson,* above, 390 U.S. at 732, 88 S.Ct. at 1326.

Defendant argues that Goldman had formed a reasonable and good faith belief in Thomas' trustworthiness. But that belief did not arise from any objective facts known about Thomas' background, or from any prior experience with him as an informant. Goldman testified that he and the authors felt that Thomas had told the truth because he had no motivation to lie to Carlson. There were, however, obvious reasons for him to doubt, if not Thomas' veracity, certainly the accuracy of his report, given its hearsay nature, the time which had passed since the alleged events had taken place, and the general tenor of the Thomas interviews, including the farfetched claims of Fratianno and the vague state of Thomas' memory.

Thomas' trustworthiness, in any event, cannot rise higher than Fratianno's. Thomas did not claim to have personal knowledge of the Nut Tree meetings; he simply repeated what he claimed Fratianno had told him. In weighing the credibility of the Thomas report, Goldman had to consider that it was based on statements by Fratianno whom he regarded as a notorious hoodlum who could not be trusted, a "liar" and a "name dropper." Goldman had also to consider that both federal and state law enforcement sources told the authors they had no information of any such meetings. Their inability to corroborate the report was necessarily significant to Goldman who knew that these sources were directly involved in investigations of organized crime, that the activities of certain of the figures involved in the Nut Tree meetings were of interest to them, and that Fratianno was in fact under occasional surveillance by one of the agencies at the time. In addition, Goldman knew that Thomas had been in contact with the FBI, yet had apparently never reported the alleged Nut Tree meetings.

Taking into consideration the nature and substance of the reports, the quality of their source, the passage of time since the original statements were said to have been made, and the complete absence of corroboration from law enforcement agencies who for several reasons would have been expected to have received some information about the meetings, the Court is compelled to conclude that there were "obvious reasons to doubt the veracity of the informant [and] the accuracy of his reports."

Defendant contends that the Thomas information was credible because it was "self-confirming", in that it referred to the formation of the bank and the making of the loans. Moreover, defendant argues, the Nut Tree meetings fit into a pattern of information relating to Alioto's connection with the Fratianno loans.

Thomas of course had an independent source of information about the bank inasmuch as the Fratianno Trucking Company had received loans from it. The other information which the authors had received concerning Alioto's part in the making of the loans did not provide a basis for any inference of improper activities or purposes. In particular, the authors had received no information that Alioto had met with Marino or anyone else other than Goldberger and Fratianno, on the occasion described above, to talk about the loan. A leap from this information to the charge of a nighttime cabal with major hoodlums to provide the financial wherewithal for underworld

business activities is too great to be performed without obvious reasons for doubt.[3]

Defendant's argument is also undercut by the fact that the authors and Goldman chose not to seek corroboration from the most obvious source, Jack Goldberger, whom the article charges neither with criminal activity nor with an interest disqualifying him as a reliable source. Yet he, aside from plaintiff, was the only other available percipient witness to the alleged meetings. To the extent he was asked pertinent questions in the telephone call from Brisson, he denied the author's assertions. But he was never asked directly about the Nut Tree meetings and his offer to answer questions at his office was not taken up. While *New York Times* imposes no liability for failure to verify the accuracy of reports, the failure to pursue what appears to have been the most obvious available source of possible corroboration must, under all of the circumstances of this case, be regarded as clear and convincing evidence of reckless disregard for the truth.

As for the authors' interview with plaintiff, while they avoided asking him about the Nut Tree meetings, they did obtain a flat denial of his knowing either LaPorte or Bompensiero, key participants in these meetings, and they received explanations of his relations with the other figures mentioned in the article which refuted the inferences and implications of the article. At the trial, Goldman and the authors took the position that, with respect to the subject matter of the article, it was their conclusion that Alioto had lied while Thomas and Fratianno had told the truth. In light of all of the evidence discussed above, and Goldman's admission that, while Fratianno was

a "liar", Alioto, so far as he knew, had never been implicated in any criminal activity or misused his office or position to shield or promote crime, the Court must conclude that Goldman's belief could not have been held in good faith.

As discussed above, the Nut Tree allegations pervade the article. They provide the thread with which Goldman and the authors spin much of "the web of alliances with . . . the leaders of the Cosa Nostra" in which Alioto was said to be enmeshed. In this fashion, the article links Alioto, either directly or inferentially to various insidious activities of organized crime figures. These allegations have heretofore been found to be false and defamatory. The Court now finds that they were made with actual malice, i. e., with reckless disregard for their truth.

## IV.

Plaintiff has asked for no special damages but seeks to recover general damages in the sum of $500,000.00 as well as punitive damages in an amount deemed appropriate by the Court.

 General damages include damages for "loss of reputation, shame, mortification and hurt feelings." Cal. Civil Code, § 48a, subd. 4(a). "In actions for libel or slander the amount of damages recoverable is peculiarly within the discretion of [the trier of fact], for there can be no fixed or mathematical rule on the subject." *Behrendt v. Times-Mirror Co.*, 30 C.A.2d 77, 90, 85 P.2d 949, 955 (1938) (hearing denied). "The [plaintiff] is not required to prove, and in the nature of things cannot prove, the extent to which he has been damaged by this libel . . . [the trier of fact]

---

**3.** As pointed out above, the authors and Goldman also had information that shortly before the loans were made, Fratianno and Marino had been in the offices of the Alioto law firm. But they had no information to substantiate the statement in the article that Marino and Fratianno met with Alioto and discussed Fratianno's finances. Nor did they have any information to warrant the inference raised by the statement in the article that "Strangely, unlike most of Fratianno's other creditors, Alioto's bank never sued for damages or recovery of the [Fratian-

no] debt." On the contrary, they had information that the bank was in the process of collecting most of the debt. They knew, moreover, that before the loans were made Fratianno had filed a financial statement with the bank showing his net worth to be $243,066.99—nonetheless, the article states: "As for his 'credit', Fratianno was a disastrous risk." These facts, together with the absence of information reflecting any questionable activities by plaintiff, further undermine the claim of "self-confirmation".

**1372**

may consider as a basis for its award of actual damages . . . the wide publicity given to the libel, the plaintiff's prominence in the community where he lives, his professional standing, his good name and reputation, his injured feelings and his mental sufferings." *Scott v. Times-Mirror Co.*, 181 Cal. 345, 365, 184 P. 672, 681 (1919).

██ There is no dispute that the charge made in the article, impugning plaintiff's fitness for public office or other positions of trust, is a grave one. Plaintiff has testified without contradiction to the apprehension and severe mental and emotional distress it has caused, and will continue to cause him and his family.

Plaintiff is a prominent member of the San Francisco community and of the legal profession. His good name and reputation are unquestioned. He has also gained a national reputation, both because of his prominence in the Democratic Party in which he has played a national and statewide role, and his stature as a leading anti-trust lawyer. Thus, the nationwide—and to some extent worldwide—dissemination of the article, over 8 million copies of which were published, inevitably caused widespread harm to his reputation.

Plaintiff was, moreover, particularly vulnerable to the kinds of allegations made in the article for two reasons. First, because of his Italian descent, plaintiff was susceptible to being associated in the public mind with what the article liberally refers to as the Cosa Nostra and the Mafia and those of their alleged members who also bear Italian names. Second, because having represented persons charged with crimes, some of whom also had alleged connections with organized crime, he suffered the lawyer's vulnerability to that public sentiment which often tends to identify the lawyer invidiously with his client. The article in fact invites the reader to make that very identification.[4]

Taking into account all of the foregoing factors, and viewing them in the light of the record as a whole, the Court determines that plaintiff shall recover general damages in the sum of $350,000.00.[5]

██ Plaintiff's claim for punitive damages is rejected. While there is abundant evidence of actual malice within the meaning of *New York Times Co. v. Sullivan*, above, there is no substantial evidence that defendant had a "state of mind arising from hatred or ill will toward plaintiff", as required by Civil Code, § 48a, subd. 4(d). See, *Cantrell v. Forest City Publishing Co.*, 419 U.S. 245, 95 S.Ct. 465, 469–470, 42 L.Ed.2d 419 (1974).

The foregoing shall constitute the Court's findings of fact and conclusions of law.

---

4. See the opinion of Chief Justice Burger dissenting (on unrelated grounds) in *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 355, 94 S.Ct. 2997, 3014, 41 L.Ed.2d 789 (1974):

"The petitioner here was performing a professional representative role as an advocate in the highest tradition of the law, and under that tradition the advocate is not to be invidiously identified with his client. The important public policy which underlies this tradition—the right to counsel—would be gravely jeopardized if every lawyer who takes an 'unpopular' case, civil or criminal, would automatically become fair game for irresponsible reporters and editors who might, for ex-ample, describe the lawyer as a 'mob mouthpiece' for representing a client with a serious prior criminal record . . . ."

5. In an affidavit filed shortly before the fourth trial, defendant stated that up to that time it had incurred costs of defense in excess of $600,000. This figure gives some indication of the cost of the litigation to both parties. While the Court, in fixing the amount of damages awarded plaintiff, has not taken those costs into account, the reasonableness of that amount is corroborated by consideration of the expense plaintiff has had to incur to achieve the vindication to which he is entitled and which only a favorable judgment affords.