Gus A. CHAFOULIAS, Appellant,

v.

Lori C. PETERSON, Respondent,

American Broadcasting Companies, Inc., a Delaware corporation, Respondent.

No. C2–01–1617.

Supreme Court of Minnesota.

Aug. 14, 2003.

Rehearing Granted Sept. 17, 2003.

Michael Berens, Erik K. Fogarty Lisle, Kelly & Berens, P.A., Minneapolis, MN, for Appellant, Gus A. Chafoulias.

Kay Nord Hunt, Phillip A. Cole, Laura A. Enga, Lommen, Nelson, Cole & Stageberg, P.A., Minneapolis, MN, for Respondent, Lori C. Peterson.

Thomas Tinkham, Dean C. Eyler, Dorsey & Whitney LLP, Minneapolis, MN; and Nathan E. Siegel, ABC, INC., Washington, DC, for Respondent, American Broadcasting Companies, Inc.

John P. Borger, Erik E. Jorstad, Patricia R. Stembridge, Faegre & Benson LLP, Minneapolis, for amici Star Tribune, Associated Press, Minnesota Public Radio, and the Business Journal of Minneapolis/St. Paul.

Terrance W. Moore, Steingart, McGrath & Moore LLC, Edina, for amicus Minnesota Broadcasters Ass'n.

Mark R. Anfinson, Minneapolis, for amicus Minnesota Newspaper Ass'n.

## OPINION

HANSON, Justice.

Appellant Gus A. Chafoulias brings this defamation action against respondent media company ABC, Inc., and respondent attorney Lori C. Peterson, alleging that ABC published a defamatory statement made by Peterson. We review the decision of the district court, affirmed by the court of appeals, that Chafoulias was a limited purpose public figure on the date of the publication and that respondents are therefore entitled to summary judgment because a reasonable jury could not conclude by clear and convincing evidence that either ABC or Peterson acted with actual malice. We affirm as to ABC but reverse and remand as to Peterson.

Chafoulias is a Rochester businessman and community leader who has achieved success as a local real estate developer. Chafoulias' development projects include the Radisson Plaza Hotel, a 212–room hotel that employs about 185 people. Because of the hotel's proximity to the internationally recognized Mayo Clinic, the Radisson regularly hosts both national and international guests. Chafoulias claims that he was not actively involved in the management of the Radisson. Activities at the hotel provide the context for the allegedly defamatory statement made by Peterson.

Between 1993 and 1995, five female Radisson employees complained to Radisson management that they were being subjected to sexual harassment and aggression by certain male Arab hotel guests. The five women scheduled a meeting with Chafoulias on May 17, 1995, to talk about their concerns, but the meeting was cancelled. The women eventually quit.

After the cancelled meeting, the hotel retained a law firm to investigate the allegations of harassment. The law firm conducted an investigation and concluded that many of the women's complaints were well founded and that Radisson management was aware that a problem existed with regard to the treatment of women by some Arab guests. The law firm recommended that the hotel hire a public relations firm to provide a media strategy and that the hotel prepare a written policy describing unacceptable guest conduct and a written anti-harassment policy for employees "which clearly states that the hotel will not tolerate harassment by guests, and sets forth the procedures available to employees who have complaints regarding improper conduct by guests."

In mid–1995, the five former employees retained Peterson to pursue federal sexual harassment claims against Chafoulias. On August 1, 1995, Peterson wrote Chafoulias that she had been retained by the women,

that the women were alleging sexual misconduct in the workplace by some guests, and that "[a]t this point we are considering all appropriate measures to remedy the circumstances brought about by * * * your managers' lack of care and judgment in response to such misconduct."

The hotel agreed to mediate Peterson's threatened claims on April 23, 1996. Several days before the scheduled mediation, Peterson distributed "Wanted" posters at public locations in Rochester. The posters featured pictures of two Arab men, identified by name, stated "$1,000 REWARD for the apprehension of these men" and asked, "Have you been sexually harassed or assaulted by an Arab man? Do you know someone who has?" The "Wanted" posters contained this legend at the bottom: "If you have any information, please contact us at: Lori Peterson & Associates." There is evidence that Peterson attempted to have the "Wanted" posters published by the *Rochester Post–Bulletin* as an advertisement, but the *Post–Bulletin* declined because questions asked in the posters "may be perceived as racist."

On April 30, 1996, Twin Cities television station KSTP broadcast the first part of a two-part series, titled "Justice For All," on the issue of alleged sexual harassment of Rochester women by Arab men. The series alleged that several women had been subjected to sexual harassment and abuse by Arab visitors to Rochester and that little had been done by authorities to arrest and prosecute the offenders. That same day, the *Rochester Post–Bulletin* carried a story headlined "Women claim harassment by Arab men" which quoted Peterson talking about the federal lawsuit. Two other related articles—"Cultural clash

can produce problems" and "Attorney built reputation on high-profile harassment cases"—also ran in the April 30, 1996, edition of the *Rochester Post–Bulletin.*

Media coverage continued in May. On May 2, 1996, the *Rochester Post–Bulletin* published an article titled "Authorities focus on all assaults against women." In this article, a county attorney and police sergeant reacted to the KSTP–TV series, admonished readers to focus on "the [general] problem of sexual and physical assault on women," and reported that "criminal charges have been filed against four Arab men in connection with the sexual assaults in Rochester." On May 3, 1996, the *Rochester Post–Bulletin* published an article titled "Punish those who are guilty, Arabs say," in which members of the Arab community voiced concern that the media's reports of alleged sexual harassment reinforced negative stereotypes.

On June 7, 1996, Peterson filed federal lawsuits on behalf of her clients against Chafoulias.[1] The suits alleged that from 1993 to 1995, the women were subjected to sexual harassment and aggression by male Arab hotel guests; that the harassment included abusive and derogatory language, unwelcome sexual commentaries, physical contacts of a sexual nature and a rape; that Chafoulias, as employer, was responsible for the actions of his managers and employees in ignoring, condoning, and contributing to the illegal acts of the hotel guests; and that Chafoulias himself knew about the offensive conduct but failed to notify the police or take other meaningful action.

The filing of these lawsuits was reported in Minneapolis' *Star Tribune* newspaper on June 8, 1996. The Radisson Plaza re-

---

1. Peterson filed six lawsuits, five on behalf of the former employees and one on behalf of the female hotel guest, S.M., who claimed to have been drugged and raped by a hotel guest in 1993. The six suits were consolidated in *D.W. v. Radisson Plaza Hotel Rochester,* 958 F.Supp. 1368 (D.Minn.1997).

sponded to that article by issuing a press release on June 13, 1996, which stated in part:

The Rochester Radisson Plaza Hotel takes allegations of harassment very seriously, and hotel management will not tolerate harassment in any form. The hotel has a rigorous harassment policy in place, and appropriate corrective or disciplinary actions are taken in situations in which the policy is found to have been violated. In addition, the hotel adopted several additional written policies that were distributed to all employees and subsequently discussed in training sessions. The hotel also developed a new policy regarding Radisson's Expectations of Conduct by Guests, which was translated into various languages.

On June 15, 1996, the *Rochester Post–Bulletin* published an article outlining the Radisson's code of conduct and sexual harassment policy titled "Radisson says it has firm policy on harassment."

About the time the suits were filed, David Page, a producer at ABC, learned about the former employees' lawsuits against Chafoulias in a conversation he initiated with Peterson. Working with Brian Ross, an investigative correspondent, Page began researching the allegations of harassment for a news report. In 1996, Page and Ross traveled once to Texas and twice to Minnesota to interview the federal-lawsuit plaintiffs and other key persons, including Peterson. In their affidavits, Page and Ross state that, after interviewing about 80 people and amassing and reviewing documents, they came to believe that Peterson's allegations were true—that the harassment had occurred and that Chafoulias knew of it.

Page and Ross invited Chafoulias to "present [his] position on this matter in [his] own words" on camera. A letter from Page to Chafoulias dated September 18, 1996, documents that Page spoke with Chafoulias on the telephone in the summer of 1996 and scheduled an on-camera interview that Chafoulias later canceled. In October 1996, when Ross and Page were in Rochester, they and their crew encountered Chafoulias on the street and conducted a brief interview. After the street interview, on June 17, 1997, Page wrote to Chafoulias, again requesting an "in-depth interview." Chafoulias responded to this letter, declining to be interviewed and submitting that "[t]he real story is [Peterson's] familiar tactic" of making threats to go to the press to encourage settlement.

Page produced a story for ABC's program *PrimeTime Live* entitled "The VIP Floor" which aired on August 6, 1997. Segments of interviews with Peterson and Chafoulias were included in the broadcast. The basis for this defamation case against Peterson and ABC is that Peterson defamed Chafoulias when ABC broadcast her statement that "Chafoulias knew. Chafoulias has known for years that these women were being attacked, harassed, raped."

In mid-May 1998, three weeks after the federal lawsuits were settled, Rochester television station KTTC broadcast an interview of Chafoulias. In an affidavit, Chafoulias explains that he acceded to KTTC's requests to an interview because "[t]he *PrimeTime Live* broadcast hurt my reputation, hurt business that I have a role in, and hurt me personally and deeply. I understood that the KTTC interview would provide an opportunity to help rehabilitate myself and my reputation and I did it for that reason." In this interview, Chafoulias defended his position in the harassment suit, thanked the community for its support and reaffirmed his commitment to Rochester.

On August 13, 1998, Chafoulias brought this defamation action against Peterson and ABC. The district court conducted a

pretrial evidentiary hearing on the question of whether Chafoulias should be regarded as a limited purpose public figure. The court concluded that Chafoulias was a limited purpose public figure on the date of the broadcast and that he would have to prove at trial that Peterson and ABC acted with actual malice. Both Peterson and ABC moved for summary judgment, and the district court granted both motions, determining that the evidence was such that a reasonable jury could not find by clear and convincing evidence that either Peterson or ABC acted with actual malice.

The court of appeals affirmed. *Chafoulias v. Peterson*, 642 N.W.2d 764, 779 (Minn.App.2002). The court upheld the district court's conclusion that Chafoulias was a limited purpose public figure on the date of the broadcast, stating that Chafoulias "actively and voluntarily injected himself into the dispute over sexual harassment in an effort to influence the outcome of the controversy," and agreed with the district court's grant of summary judgment to both Peterson and ABC. *Id.* at 773, 774–79.

On appeal to this court, Chafoulias argues that he was a private figure on the day of the broadcast and that he need only establish by a preponderance of the evidence that Peterson and ABC knew, or in the exercise of reasonable care should have known, that Peterson's statement was false. *See Jadwin v. Minneapolis Star & Tribune Co.*, 367 N.W.2d 476, 491 (Minn. 1985). Peterson and ABC argue that Chafoulias was properly characterized as a limited purpose public figure and that summary judgment was thus appropriate because the record does not provide clear and convincing evidence of either Peterson's or ABC's actual malice.

For reasons we will discuss below, the legal analysis of these issues must be conducted separately for ABC and for Peterson. We agree with the district court and court of appeals that Chafoulias must be regarded as a limited purpose public figure as to ABC and that he failed to provide clear and convincing evidence that ABC acted with actual malice. As to Peterson, however, we conclude that there are genuine issues of material fact on the questions of whether Peterson's conduct created the "public controversy" and, in that context, whether Chafoulias voluntarily injected himself into that public controversy. Those issues must be decided by the district court and supported by written findings of fact before we can determine whether Peterson is disqualified by her conduct from relying on the limited purpose public figure privilege to obtain the additional constitutional protection of the actual malice standard.

## I.

We will first discuss the privilege that attaches to speech directed to a limited purpose public figure and the procedure the district court should follow to determine whether that privilege exists in a given case.

The United States Supreme Court decided the landmark case of *New York Times Company v. Sullivan*, 376 U.S. 254, 279–80, 285–86, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), which held that the privilege that attached to certain speech under the First Amendment of the federal constitution applied to comments concerning "public officials," so that such an official would be required to show actual malice with convincing clarity in order to recover damages for defamation. The Court extended *New York Times'* actual malice standard to "public figures" in *Curtis Publishing Company v. Butts*, 388 U.S. 130, 155, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967). Finally, in *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 351, 94 S.Ct. 2997, 41 L.Ed.2d 789

(1974), the Court clarified that the actual malice standard also applied to limited purpose public figures.

The *Gertz* Court explained that two factors justify applying the actual malice standard to public officials and public figures. First, "public officials and public figures usually enjoy significantly greater access to the channels of effective communication and hence have a more realistic opportunity to counteract false statements then [sic] private individuals normally enjoy. Private individuals are therefore more vulnerable to injury, and the state interest in protecting them is correspondingly greater." *Id.* at 344, 94 S.Ct. 2997 (footnote omitted). Second, "[t]hose classed as public figures * * * have assumed roles of especial prominence in the affairs of society * * * [and] invite attention and comment." *Id.* *Gertz* held that "an individual [who] voluntarily injects himself or is drawn into a particular controversy * * * thereby becomes a public figure for a limited range of issues." *Id.* at 351, 94 S.Ct. 2997.

It is generally assumed that the question of the availability of the public figure privilege is a question of law for the court to decide. The United States Supreme Court has stated clearly that the question of "public official" privilege "is for the judge in the first instance to determine." *Rosenblatt v. Baer*, 383 U.S. 75, 88, 86 S.Ct. 669, 15 L.Ed.2d 597 (1966). Although the Court has not explicitly stated that the same is true for the "public figure" privilege, the Court has approached the issue as one of law. *See, e.g., Wolston v. Reader's Digest Association, Inc.*, 443 U.S. 157, 167–69, 99 S.Ct. 2701, 61 L.Ed.2d 450 (1979); *Gertz*, 418 U.S. at 352, 94 S.Ct. 2997. *See also* 1 Rodney A. Smolla, *Law of Defamation*, §§ 2:116–2:218 (2d ed.2003). We have likewise viewed the question of the public figure privilege as

one of law and have also stated that we review such a legal determination de novo. *Britton v. Koep*, 470 N.W.2d 518, 520 (Minn.1991); *Jadwin*, 367 N.W.2d at 483.

The treatment of the public figure privilege as a question of law is relatively straightforward where the material facts concerning public figure status are not in dispute. But where the facts concerning a person's limited purpose public figure status are in dispute, the role of the court is not as clear. Preliminary questions of considerable importance concerning that role are: (1) Does the classification of the public figure privilege issue as one of "law" modify the traditional roles of the district court and the appellate courts with respect to contested issues of historical fact material to the existence of the privilege? (2) If so, must this court then act as the ultimate fact finder on those contested issues of fact? (3) If not, and if the fact finding function remains with the district court, must the district court make written findings of fact, and what is the standard of review that this court should apply to the district court's findings?

The parties do not specifically address these questions. Chafoulias recognizes that the privilege has been classified as a "legal issue" but then relies on traditional summary judgment standards that would require viewing the evidence in the light most favorable to him and preclude the pretrial resolution of genuine issues of material fact. ABC counters that "[w]hether a person is a public figure is a pure question of constitutional law, which this court reviews *de novo*." Peterson simply argues the facts.

The Restatement (Second) of Torts, § 580A. cmt. c (1977), classifies the question of whether a plaintiff is a "public figure" as "one of law, not of fact," but recognizes that "the facts on which the determination is to be made may be in

dispute and therefore subject to the determination of the fact finder." That comment does not identify who that "fact finder" should be, but that issue is specifically addressed in Restatement (Second) of Torts, § 619 cmt. a (1977), which discusses the respective functions of the court and jury in connection with the determination of privileges. The comment states:

> Whether a privilege exists at all is a question for the court. This requires the court to determine whether the circumstances under which the publication was made were such as * * * to make the publication privileged. * * * *If the facts are in dispute, the jury is called upon to consider the evidence and pass upon the issues thus raised. It is for the court, however, to decide whether the facts found by the jury made the publication privileged or to instruct the jury as to what facts they must find in order to hold the publication privileged.*

(Emphasis added.) *See also* Smolla, *Law of Defamation,* at §§ 2:120–2:121 ("In some cases it may be the judge's conviction that a relatively brief evidentiary hearing may be sufficient to clarify any ambiguities in the paper record, permitting the trial judge to rule on the public figure issue in advance of the trial. * * * At other times, of course, the circumstances may be such that nothing at all will be saved by such a hearing, in which case, if material issues of fact are in dispute, the public figure issue must simply be carried forward with the trial.").

Even if the "factual disputes are not to be left to the jury at trial, but should be resolved by the trial court prior to trial, after an evidentiary hearing solely on this issue, if necessary," as suggested by a sister court in *Bay View Packing Co. v. Taff,* 198 Wis.2d 653, 543 N.W.2d 522, 530 (App.1995), this would not mean that the traditional roles of district court and the appellate courts relating to fact finding would be modified. Traditionally, the district court would support its legal conclusion with specific findings on contested issues of historical fact material to that conclusion. 2 David F. Herr & Roger S. Haydock, *Minnesota Practice–Civil Rules Ann.* § 52.3 (1998). And an appellate court would not disregard the district court's findings of fact on contested issues of fact and make its own findings but would review the district court's findings for clear error. Minn. R. Civ. P. 52.01; *see also State, Lake Minnetonka Conservation Dist. v. Horner,* 617 N.W.2d 789, 795 (Minn.2000) (quoting *State v. Lee,* 585 N.W.2d 378, 383 (Minn.1998)).

Because the decisions of the United States Supreme Court do not prescribe the procedure a state court must use to resolve contested issues of fact while determining the existence of a constitutional privilege as a question of law, we conclude that the federal constitution permits a state court to use traditional methods for resolving fact disputes that are material to the existence of a privilege. That could include submission to a jury for special interrogatory verdicts or under specific instruction as to the elements of the privilege.[2] Alternatively, it could include pretrial submission to the district court for determination by specific findings of fact based upon an evidentiary hearing, subject to appellate review for clear error.

Support for this conclusion can be drawn by analogy from our decisions and those of the United States Supreme Court concern-

---

**2.** *In Utecht v. Shopko Dept. Store,* 324 N.W.2d 652, 654 (Minn.1982), we reversed summary judgment on the existence of a qualified privilege based on the plaintiff's consent to the publication, stating there is "a factual question for a jury as to whether the publication was within the scope of the consent."

ing the standard of review of findings of fact relevant to the existence of probable cause for a search and seizure. These decisions often contain general statements that the determination of probable cause is a question of law for the court and that an appellate court makes an independent review of the record to determine probable cause. *See, e.g., State v. Harris,* 590 N.W.2d 90, 98 (Minn.1999); *State v. Othoudt,* 482 N.W.2d 218, 221 (Minn.1992); *State v. Storvick,* 428 N.W.2d 55, 58 n. 1 (Minn.1988). But those statements only apply where the historical facts material to the existence of probable cause are not contested. Where the historical facts are contested, the United States Supreme Court has held:

> [A]s a general matter determinations of reasonable suspicion and probable cause should be reviewed *de novo* on appeal. Having said this, we hasten to point out that a reviewing court should take care both to review findings of historical fact only for clear error and to give due weight to inferences drawn from those facts by resident judges and local law enforcement officers.

*Ornelas v. United States,* 517 U.S. 690, 699, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996).

Similarly, we have said that "[w]e review the district court's findings of historical fact relating to the probable cause determination for clear error under the clearly erroneous standard but we independently review *de novo* the issue of probable cause." *Lee,* 585 N.W.2d at 383 (citing *Ornelas,* 517 U.S. at 699, 116 S.Ct. 1657; *State v. Wiernasz,* 584 N.W.2d 1 (Minn. 1998); *State v. Shoen,* 578 N.W.2d 708 (Minn.1998)); *see also Horner,* 617 N.W.2d at 795 ("While we give 'due weight to inferences drawn from those facts by resident judges,' we review de novo the legal conclusion of whether probable cause existed.").

■ Here, the district court selected the alternative of conducting a pretrial evidentiary hearing to determine whether Chafoulias was a limited purpose public figure. Because this is a permissible alternative, we agree that the process followed by the court was within its discretion. But the court did not make specific findings of fact or differentiate between the claims against ABC and the claims against Peterson. Accordingly, the court's decision does not provide a basis for appellate review of the resolution of any genuine issues of material fact relevant to the limited purpose public figure privilege. We can only affirm the court's conclusions to the extent they were based on undisputed facts.

## II.

With this framework in mind, we turn our analysis to the record that exists as to Chafoulias' claims against ABC. The criteria to be used in that analysis are suggested by *Gertz,* where the United States Supreme Court looked to three factors to determine whether Gertz was a limited purpose public figure: (1) whether a public controversy existed; (2) whether the plaintiff played a meaningful role in the controversy; and (3) whether the allegedly defamatory statement related to the controversy. 418 U.S. at 352, 94 S.Ct. 2997.

### A. Public Controversy

■ A public controversy is a dispute that "has received public attention because its ramifications will be felt by persons who are not direct participants." *Waldbaum v. Fairchild Publ'ns, Inc.,* 627 F.2d 1287, 1296 (D.C.Cir.1980); *accord Trotter v. Jack Anderson Enters., Inc.,* 818 F.2d 431, 433–34 (5th Cir.1987); *Lundell Mfg. Co. v. Am. Broad. Co.,* 98 F.3d 351, 363 (8th Cir.1996). Private concerns are not

public controversies simply because they attract attention. *See Time, Inc. v. Firestone*, 424 U.S. 448, 454–55, 96 S.Ct. 958, 47 L.Ed.2d 154 (1976); *see also Wolston*, 443 U.S. at 167–68, 99 S.Ct. 2701. In isolating the public controversy, courts look to those controversies that are already the subject of debate in the public arena at the time of the alleged defamation. *See, e.g., Bruno & Stillman, Inc. v. Globe Newspaper Co.*, 633 F.2d 583, 591 (1st Cir.1980); *Waldbaum*, 627 F.2d at 1297.

We agree with the district court and the court of appeals that the undisputed facts show that sexual harassment of Rochester women by male Arabs had become a matter of public interest by the time of the *PrimeTime Live* broadcast. By that time, the Rochester press had reported the allegations of sexual abuse by Arab visitors and the failure of the Radisson management to respond appropriately. The *Rochester Post–Bulletin* published at least seven articles in 1996 related to these concerns, representing the positions of the sexual harassment victims, the Arab community, and the Radisson. KSTP–TV reported on incidents of harassment and abuse that took place at various locations in Rochester in its two-part series, which focused on the lack of police investigation into the allegations of harassment and abuse and the failure to prosecute the perpetrators.

■ But the scope of the public controversy, for this purpose, may be narrower than the breadth of the public's interest. Many stories may be considered "newsworthy" and deserving of the public's attention, but may not be a "public controversy." A public controversy requires two elements: (1) there must be some real dispute that is being publicly debated; and (2) it must be reasonably foreseeable that the dispute could have substantial ramifi-

cations for persons beyond the immediate participants. *Waldbaum*, 627 F.2d at 1296–97; *see also Time*, 424 U.S. at 454–55, 96 S.Ct. 958.

Under this definition, the existence of a private civil dispute is not necessarily a public controversy. Although such a dispute may receive publicity by inevitably becoming public when filed in court, or when a party chooses to make his or her allegations public, the courts have recognized that the mere participation in the litigation of such disputes does not create a public controversy that confers public figure status. *See, e.g., Time*, 424 U.S. at 457, 96 S.Ct. 958; *LeDoux v. Northwest Publ'g, Inc.*, 521 N.W.2d 59, 66 (Minn.App. 1994); *see also Wolston*, 443 U.S. at 167–68, 99 S.Ct. 2701 (holding that defense of contempt charge did not render Wolston a public figure); *Gertz*, 418 U.S. at 352, 94 S.Ct. 2997 (determining that an attorney who voluntarily associated himself with a case that was certain to receive media exposure was not a public figure).

■ Thus, the public controversy was not that the women made and filed lawsuits alleging sexual harassment. Instead, as properly defined by the court of appeals, the controversy that had expanded beyond the private civil dispute and could have substantial ramifications for persons beyond the immediate participants was "[t]he debate * * * about whether the allegations were being sufficiently investigated by the women's employers or Rochester law-enforcement officials." *Chafoulias*, 642 N.W.2d at 770. We conclude that the undisputed facts show that this public controversy existed as of the date of the ABC broadcast.

*B.   Chafoulias' Role in the Public Controversy*

Having determined that a public controversy existed at the time of the *Prime-*

*Time Live* broadcast, we turn to an evaluation of Chafoulias' role in that controversy. This requires us to determine whether Chafoulias "voluntarily inject[ed] himself" or was "drawn into" that controversy. *Gertz,* 418 U.S. at 351, 94 S.Ct. 2997. In other words, we must consider whether Chafoulias thrust himself to the forefront of the controversy as we have defined it so as to achieve a "special prominence" in the debate and become a factor in resolving the controversy. *Id.* Chafoulias must either "have been purposely trying to influence the outcome" of the controversy or must have realistically "expected, because of his position in the controversy, to have an impact on its resolution." *Waldbaum,* 627 F.2d at 1297 (footnote omitted) (noting "[t]rivial or tangential participation is not enough"). In undertaking this analysis, we may look to the extent to which Chafoulias' participation in the public controversy was voluntary, the extent to which Chafoulias had access to channels of effective communication to counteract false statements, and the prominence of the role Chafoulias played in the public controversy. *Gertz,* 418 U.S. at 344–45, 94 S.Ct. 2997.

Again, we recognize that ABC stands in a different position than Peterson on this issue. Because ABC did not create the controversy, which existed before ABC's broadcast, ABC is entitled to rely on any actions by Chafoulias that were not made in response to actions of ABC. Stated another way, Chafoulias cannot avoid limited purpose public figure status as to ABC by arguing that his involvement in the controversy was involuntarily induced by Peterson.

Chafoulias argues that he is a private figure because he did not take any voluntary action to thrust himself into the public eye for any reason; instead, he was "dragged unwillingly" into the federal law-

suits by his ex-employees and into the limelight by Peterson. *See Wolston,* 443 U.S. at 166, 99 S.Ct. 2701. He claims that the hotel's hiring of the media consultant, the letter to KSTP–TV, and the letter to Page were measured responses and thus fail to support the conclusion that Chafoulias thrust himself to the forefront of the controversy. While these arguments have relevance to his claims against Peterson, they are not relevant to ABC, which is entitled to rely on the circumstances as it found them, including the actions of Chafoulias that were induced by Peterson but not by ABC.

We conclude that, as to ABC, the undisputed facts show that Chafoulias did thrust himself into the public controversy. *See Gertz,* 418 U.S. at 345, 94 S.Ct. 2997. First, we note that just as defamation defendants cannot create their own defense "by pointing to the attention they have themselves visited upon a plaintiff as evidence that the plaintiff is a public figure,"

> the plaintiff is not permitted to avoid the [limited purpose public figure status] by protesting, "I didn't want the attention." The proper question is not whether the plaintiff volunteered for the publicity but whether the plaintiff volunteered for an activity out of which publicity would foreseeably arise.

Smolla, *Law of Defamation* at §§ 2:30, 2:32. Thus, Chafoulias' claim that he neither sought nor desired public attention is unavailing.

Second, the record shows that Chafoulias had access to the media and that, independent of any action by ABC, he used the media to promote his position in the dispute. *See Jadwin,* 367 N.W.2d at 486 (stating that effective media access is "distinguishing feature" of public figures). In correspondence with KSTP–TV, Chafoulias stated that the hotel "and other area businesses" had been affected "by the is-

sues you intend to raise in your story" and admonished KSTP–TV to share the hotel's harassment policy with viewers. The *Rochester Post–Bulletin* published an article outlining the Radisson's harassment policy two days after the Radisson issued a press release in response to the harassment charges. The two-part 1998 KTTC interview, though taking place after the alleged defamation, demonstrates that Chafoulias had broad media access, allowing him to strategically place media appearances that could influence the ultimate outcome of the controversy surrounding the harassment allegations.

Third, the record shows that Chafoulias has "assumed [a] role[] of especial prominence in society" that naturally "invite[s] attention and comment" from the public and the press. *Gertz*, 418 U.S. at 345, 94 S.Ct. 2997. By seeking public and government support for development projects that have a significant impact on Rochester, Chafoulias has assumed a position that invites attention and comment about the manner in which he conducts his business affairs.

### C. Relationship of the Statement to the Public Controversy

Our final inquiry in determining whether Chafoulias is a limited purpose public figure as to ABC requires that there be a relationship between Peterson's statement and the public controversy. Because Peterson's statement relates directly to the possibility that an employer and community leader failed to respond to known sexual harassment and abuse of female employees by male Arab visitors, Peterson's statement is necessarily germane to the public controversy.

Accordingly, we agree with the district court and court of appeals that there is no genuine issue of material fact regarding Chafoulias' status as a limited purpose

public figure as to ABC, and we affirm that determination.

### D. Clear and Convincing Evidence of Actual Malice by ABC

We next turn to the question of whether Chafoulias has established a prima facie claim of defamation by clear and convincing evidence that ABC acted with actual malice. *New York Times*, 376 U.S. at 279–80, 84 S.Ct. 710; *Britton*, 470 N.W.2d at 520. "Actual malice" is a term of art; it means that the defendant acted "with knowledge that [the publication] was false or with reckless disregard of whether it was false or not." *New York Times*, 376 U.S. at 279–80, 84 S.Ct. 710; *accord Fitzgerald v. Minnesota Chiropractic Ass'n, Inc.*, 294 N.W.2d 269, 270 (Minn.1980). For example, as the Supreme Court has noted, a statement may have been made with actual malice if it

> is fabricated by the defendant, is the product of his imagination, * * * is based wholly on an unverified anonymous telephone call [or if] the publisher's allegations are so inherently improbable that only a reckless man would have put them in circulation.

*St. Amant v. Thompson*, 390 U.S. 727, 732, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968). Moreover, "actual malice" does not mean that the defendant acted with ill will or spite. *Harte–Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657, 665–67, 666 n. 7, 109 S.Ct. 2678, 105 L.Ed.2d 562 (1989); *Moreno v. Crookston Times Printing Co.*, 610 N.W.2d 321, 329 (Minn.2000) (noting that actual malice has "nothing to do with motive or ill will in the publishing of otherwise defamatory statements").

Notably, the standard for "reckless disregard for truth" is a subjective one; "reckless disregard" does not mean "recklessness" in the ordinary sense of extreme negligence. *Britton*, 470 N.W.2d

at 524 (citing *Diesen v. Hessburg,* 455 N.W.2d 446, 464 (Minn.1990)). Instead, "reckless disregard" requires that a defendant make a statement while subjectively believing that the statement is probably false. *Hirman v. Rogers,* 257 N.W.2d 563, 566 (Minn.1977) (quoting *St. Amant,* 390 U.S. at 731, 88 S.Ct. 1323) (internal quotation marks omitted) ("Mere errors in judgment are not sufficient to constitute actual malice and a defamatory statement must have been made with an awareness of its probable falsity, as demonstrated by sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication.").

■ On review, whether the evidence in the record is sufficient to support a finding of actual malice by clear and convincing evidence is a question of law which this court reviews de novo. *See Britton,* 470 N.W.2d at 520, 524; *Diesen,* 455 N.W.2d at 453–54; *see also Bose Corp. v. Consumers Union of United States, Inc.,* 466 U.S. 485, 514, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984) (holding that "[a]ppellate judges * * * must exercise independent judgment and determine whether the record establishes actual malice with convincing clarity").

Chafoulias argues that a reasonable jury could find evidence clearly probative of ABC's actual malice because "The VIP Floor" was edited to give the impression that Chafoulias knew that all five of the former employees were raped. Chafoulias points out that although D.W. admitted in the taped interview with ABC that she never explicitly told Chafoulias about being raped, this admission was not included in the broadcast segment. Additionally, Chafoulias argues that ABC acted with actual malice because ABC failed to verify Peterson's credibility. ABC argues that the record demonstrates that ABC believed that Peterson's statement, including her use of the word "rape," was true and corroborated.

■ Although a "highly slanted perspective" may contribute to a finding of actual malice, such a perspective is not enough by itself to establish actual malice. *Stokes v. CBS Inc.,* 25 F.Supp.2d 992, 1003, 1008 (D.Minn.1998). Furthermore, mere failure to investigate Peterson is not dispositive of actual malice. *St. Amant,* 390 U.S. at 733, 88 S.Ct. 1323; *see also Alioto v. Cowles Communications, Inc.,* 430 F.Supp. 1363, 1371 (N.D.Cal.1977) (noting that *New York Times* does not impose liability for failure to verify the accuracy of reports). Again, to meet the actual malice standard, "[t]here must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." *St. Amant,* 390 U.S. at 731, 88 S.Ct. 1323.

■ We conclude that there is nothing in the record to evidence an awareness by ABC of the probable falsity of Peterson's statement. Instead, the record supports the conclusion that ABC attempted to verify Peterson's allegations. Page and Ross interviewed each of the federal lawsuit plaintiffs and several other persons. Page and Ross elicited Chafoulias' perspective and included his comments in "The VIP Floor." Even if ABC had any reason to doubt Peterson's veracity, the undisputed facts show that Page and Ross undertook an independent investigation to substantiate Peterson's statement.

We agree with the district court and the court of appeals that the record does not contain clear and convincing evidence of ABC's actual malice, and thus we affirm the grant of summary judgment to ABC.

## III.

We now turn to the question of whether any genuine issues of material fact exist to preclude the grant of summary judgment to Peterson. Although the analysis of whether Chafoulias should be regarded as a limited purpose public figure as to Peterson is similar to that concerning ABC, it is not identical because of the differing roles of ABC and Peterson in allegedly causing the public controversy. We have concluded that a public controversy existed at the time that ABC broadcast Peterson's statement, and thus that ABC's broadcast was not the source of the public controversy. But Peterson's actions precede the *PrimeTime Live* broadcast by several months, and Chafoulias has presented evidence to show that she was the source for the media coverage on which she relies to prove the existence of a public controversy. This evidence is relevant because defamation law recognizes that a defamation defendant cannot take advantage of the limited purpose public figure privilege with respect to a public controversy that she caused. *See, e.g., Hutchinson v. Proxmire*, 443 U.S. 111, 135, 99 S.Ct. 2675, 61 L.Ed.2d 411 (1979) ("Clearly, those charged with defamation cannot, by their own conduct, create their own defense by making the claimant a public figure."); *Wolston*, 443 U.S. at 166, 99 S.Ct. 2701 (concluding that Wolston was "dragged unwillingly into the controversy"); *Pearce v. E.F. Hutton Group*, 664 F.Supp. 1490, 1507 (D.D.C.1987) ("Defendant cannot bootstrap himself into the protection of the actual malice standard by pointing to the controversy over the plaintiff that he himself created by his publication.").[3]

Accordingly, if Peterson was the source of the media coverage that she relies upon to establish a public controversy, she would be disqualified from asserting the privilege for speech concerning a limited purpose public figure.[4] This analysis requires us to examine more closely the evidence concerning when the public controversy (which was present by August 6, 1997) arose, whether Peterson was the source of that controversy and whether, as to Peterson, Chafoulias' response was truly "voluntary."

### A. When did the public controversy arise?

The undisputed evidence shows that the public controversy did not arise during the

---

**3.** The dissent argues that the limited purpose public figure status depends on the actions of the plaintiff (Chafoulias) not the defendant (Peterson) and that if Chafoulias is a limited purpose public figure as to ABC, he must also have the same status as to Peterson. We read the caselaw differently, to recognize that even though a plaintiff's actions might otherwise place him in the status of a limited purpose public figure, the actions of a defendant are relevant to whether a defendant may rely upon the limited purpose public figure privilege as a defense. Under the cases listed above, a defendant may be disqualified from asserting the privilege, in a manner akin to estoppel, even though the plaintiff's conduct would otherwise give rise to the privilege.

**4.** The dissent would distinguish between causing a public controversy and publicizing the public controversy. That distinction might have merit where a publication merely reveals an existing public controversy but does not cause it. But that circumstance is not present here because the ultimate public controversy—the debate about whether the allegations of sexual harassment were being sufficiently investigated by the women's employers or Rochester law enforcement officers—cannot be separated from Peterson's publication of her allegations. In other words, viewing the evidence most favorably to Chafoulias, the only basis for the debate was Peterson's allegations. Those allegations have never been proven to be true and, for purposes of the determination of the existence of the privilege, we cannot assume that they were true.

period from 1993 through 1995, when the five female Radisson employees complained to Radisson management about harassment, or even when two of them complained directly to Chafoulias: those complaints were private. It is true that the complainants asserted that Radisson management did not appropriately respond to their complaints, but those assertions are only relevant to the underlying private litigation. They were not shown to have created, or even to have become a part of, a public controversy at the time they were made.

The Radisson's mid–1995 retention of a law firm to investigate the complaints of harassment did not create or contribute to create a public controversy. The law firm conducted its investigation privately. Although the law firm recommended that the hotel hire a public relations firm to develop a media strategy, this recommendation did not suggest either that the private controversy had become public or that the Radisson should take any action to make it public. To the contrary, the law firm recommended the retention of a public relations firm only because of the law firm's expectation that Peterson, who by then had been identified as the attorney for the complainants, would follow a strategy of making such claims public in order to use the media to pressure settlement. The law firm's recommendation was to develop a media strategy that was designed to react to the media initiatives of Peterson.

Similarly, the Radisson's mid–1995 retention of the public relations firm did not contribute to or create a public controversy. That hiring was in direct response to the law firm's report of Peterson's "repu-

tation in the legal community for using the media * * *." The work of the public relations firm was private. And while the public relations firm considered whether the Radisson should make a preemptive strike in the media, it ultimately recommended against a media battle with Peterson and proposed a media plan that was to be reactive only.

No publicity of any kind concerning the public controversy, as earlier defined, appeared anywhere before Peterson notified Chafoulias in August of 1995 that she represented former hotel employees. In fact, no publicity of any kind concerning the public controversy appeared anywhere before April 20, 1996, when Peterson caused the "Wanted" posters to be distributed in Rochester.[5]

Thereafter, there was a media explosion. The *Rochester Post–Bulletin* published at least seven articles between April 24 and May 3, 1996, and KSTP–TV broadcast a two-part series on April 30 and May 1, 1996, reporting that women were being harassed and questioning whether officials were responding appropriately. Thus, within a matter of the few days from April 20 to May 3, 1996, there was, for the first time, evidence of a "public controversy." The critical question, however, is whether Peterson was the source of that "public controversy."

### B. Was Peterson the source of this public controversy?

Chafoulias has presented considerable evidence to support his claim that Peterson was the source of any public controversy.

---

**5.** Peterson suggests that the Mayo Clinic had been "conducting workshops on Arab culture for a number of years," but the only "evidence" concerning them is contained in the *Rochester Post–Bulletin* article of April 24, 1996, which describes them as private workshops for Mayo volunteers, not as public events or events that generated any publicity prior to the April 24, 1996, article.

1. There is evidence that Peterson's customary practice is to use the media as a litigation tool. Her reputation in the legal profession, her familiarity with the media and her own yellow-page ad suggest a history of significant media coverage of sexual harassment cases where she represented the claimants. The report of the Radisson's law firm stated:

> Lori Peterson, the attorney whose firm is representing the women, has a notorious reputation in the legal community for using the media as a way of forcing defendants to settle through payments of large sums of money at an early stage. She is very capable of making this matter highly public and will portray it in the most damaging light possible for the hotel.

The report of the Radisson's public relations firm stated: "Finally, because Lori Peterson, who is representing the plaintiffs, has a propensity to utilize the media to garner attention and influence the outcome of her cases, there is a strong likelihood that the media will become aware of this issue as soon as a complaint is filed." [6]

2. Peterson caused the distribution of "Wanted" posters in Rochester on April 20, 1996. The most intense period of media attention occurred shortly after the "Wanted" posters were distributed. This proximity in time is strong evidence of Peterson's involvement.

3. Peterson does not deny initiating contact with the *Rochester Post–Bulletin* but only claims not to remember. The April 30, 1996, article that announces the claims of the clients represented by Peterson supports the inference that she did initiate that contact. The article provides an announcement of the claims of Peterson's clients and she is quoted liberally. The same reporter who wrote that article also wrote the other two articles appearing in the *Post–Bulletin* on April 30, 1996, one discussing Peterson's reputation for the handling of sexual-harassment claims and the other providing a broader discussion of the issue of sexual harassment by Arab guests at the Mayo Clinic. Thus, all three articles are linked to Peterson.

4. Peterson acknowledged that she "might have" initiated contact with KSTP–TV before its broadcast and later that she "probably" called KSTP–TV to encourage its interest in the harassment claims.

5. Peterson also encouraged the interest of ABC. The ABC producer testified that when he called Peterson on an unrelated subject, she stated that "she did in fact have another case that I might want to take a look at." [7]

The only publicity not directly traced to Peterson is the *Rochester Post–Bulletin* article of April 24, 1996, entitled "Most Arab patients find Rochester friendly." Chafoulias' argument is that one could infer that the *Rochester Post–Bulletin* decided to publish this article because of contacts with Peterson concerning the "Wanted" posters or from other contacts with Peterson, given its close proximity to the three articles published on April 30, 1996. Further, Chafoulias argues that even if the April 24, 1996, article was not

---

6. Chafoulias also notes that in January 1997, Peterson was sanctioned by the Hennepin County District Court in an unrelated case, in part for her use of the media.

7. There is also evidence that Peterson called the *Rochester Post–Bulletin* in January 1998 to report that Chafoulias may have difficulties in carrying out a proposed downtown Rochester redevelopment project involving the new Hilton hotel because he could not afford to pay his lawyers in a sexual harassment suit involving the Rochester Radisson Plaza Hotel. Chafoulias cites this as another example of her initiative with the media.

linked to Peterson, that article did not evince or create a "public controversy."

The article does not discuss any particular public dispute or debate. It focuses on the public's interest in several general aspects of the Arab culture. It discusses the positive actions that the Mayo Clinic had taken to train its volunteers to help Arab patients feel at ease: greeting them. in their own language; not interrupting them in prayer; knowing their customs · for shaking hands in greeting; not asking direct or personal questions; not referring to them as "foreigners"; and not using American colloquialisms. Only the last two paragraphs of a lengthy article discuss the issue of sexual harassment by Arab men of American women. It explains some of the cultural reasons why this might occur and describes the firm and appropriate response by Mayo officials when it does. There is nothing in the article to suggest that sexual harassment is a widespread problem, that officials condone it or that employers or law enforcement are not appropriately responding to it.

We conclude that this evidence presents a genuine issue of material fact on the question of whether Peterson caused the "public controversy" and, if viewed in the light most favorable to Chafoulias, would disqualify her from asserting the limited purpose public figure privilege.

*C. Can Peterson claim that Chafoulias voluntarily injected himself into this public controversy?*

■ Given the evidence of Peterson's role in the public controversy, we also conclude there are genuine issues of material fact on the question of whether Chafoulias voluntarily injected himself into that public controversy with Peterson.

■ Where a plaintiff's attorney decides to frame the litigation strategy broadly, to include attacks on the defendant in the media, it is difficult to say that the defendant's adoption of a defensive-media strategy is "voluntary," any more than providing an answer, participating in discovery or attending trial would be "voluntary." The court of appeals has said that the participation of a party in litigation does not create a public controversy or confer limited purpose public figure status. *LeDoux,* 521 N.W.2d at 66. We· conclude that where a plaintiff's attorney does not confine the litigation to the proceedings contemplated by the court rules but uses the media to enhance the plaintiff's litigation posture and to put pressure on the defendant to settle, a defendant's reactive participation in the resulting media attention to the case is likewise not "voluntary."

In *Foretich v. Capital Cities/ABC,* the federal court determined that the defamation plaintiffs who were formerly the defendants in well-publicized litigation, did not "voluntarily assume a role of special prominence in a public controversy in order to influence its outcome," even where the plaintiffs spoke frequently with news reporters, appeared on television, participated in news conferences and spoke at public gatherings. 37 F.3d 1541, 1556 (4th Cir.1994) (citing *Time,* 424 U.S. at 453, 96 S.Ct. 958; *Wolston,* 443 U.S. at 166–69, 99 S.Ct. 2701). The test, the court said, is whether the plaintiffs' actions were in self defense; that is, whether they were (1) responsive to the defendant's attacks, (2) proportionate to those attacks, and (3) not excessively published. *Id.* at 1559.

Measured by these criteria, there are genuine issues of material fact on the question of whether Chafoulias' conduct was sufficient to make him a limited purpose public figure as to Peterson. He provided evidence that his strategy was to

be strictly reactive and that he kept within that strategy; that his responses were directed at the allegations made against the hotel, were measured and were not excessive; and that, to the extent they were intended to influence the outcome of the litigation, they were responsive to Peterson's initiation of media efforts that were likewise intended to influence the outcome of the litigation. We agree with the observation of the Fourth Circuit Court of Appeals in *Foretich:*

> In the three decades since the Supreme Court handed down its decision in *New York Times Co. v. Sullivan,* we have struggled to find the proper balance between the protection of reputational interests, on the one hand, and of free expression, on the other. At first blush, one might characterize our decision today as favoring the former over the latter. But such a characterization would miss the point. We see no good reason why someone dragged into a controversy should be able to speak publicly only at the expense of foregoing a private person's protection from defamation. By allowing the Foretiches to defend their good names without succumbing to public-figure status, we protect not only their own interests in reputation, but also society's interest in free speech. Further extending the *New York Times* actual malice standard here would serve only to muzzle persons who stand falsely accused of heinous acts and to undermine the very freedom of speech in whose name the extension is demanded. By freely permitting the Foretiches to respond to Dr. Morgan's charges against them—charges that have never been proved in any court of law—we foster both the individual interest in self-expression and the social interest in the discovery and dissemination of truth—the very goals

that animate our First Amendment jurisprudence.

*Foretich,* 37 F.3d at 1564 (internal citation and quotation marks omitted).

We conclude that there are genuine issues of material fact on the questions of whether the conduct of Peterson caused the public controversy and whether, as to Peterson, Chafoulias voluntarily injected himself into that controversy. The district court conducted an evidentiary hearing and reached the legal conclusion that "Chafoulias was a limited purpose public figure on the date of the alleged defamatory broadcast, August 6, 1997," but made no findings as to these genuine issues of material fact relevant to the claim against Peterson. Accordingly, we reverse and remand this aspect of the case to the district court for further proceedings. The court, in its discretion, may proceed to decide these genuine issues of material fact based on the previous evidentiary hearing, or it may conduct any supplemental hearing it determines to be appropriate.

Affirmed in part, reversed in part and remanded.

ANDERSON, RUSSELL A., Justice.

I respectfully dissent. I agree with the majority's conclusion that Chafoulias is a limited purpose public figure but part company with its conclusion that ABC stands in a different position than Peterson on the issue. I conclude, as must the majority, that the factual record is sufficient to allow this court to reach the legal conclusion that Chafoulias is a limited purpose public figure. As to the issue of actual malice, I agree with the majority that summary judgment was appropriately granted as to ABC. Because I would conclude that Chafoulias is a limited purpose public figure as to Peterson as well, I would also take the further step to conclude that Peterson is

entitled to summary judgment. There are no facts before us that would clearly and convincingly support a finding that either ABC or Peterson acted with actual malice. Thus, I would affirm the court of appeals.

My disagreement with the majority begins at the first step of the limited purpose public figure analysis. While I agree with the majority that a public controversy existed at the time of the *PrimeTime Live* broadcast, the public controversy as framed by the majority is too narrow. As the majority presents it, the public controversy was "about whether the allegations were being sufficiently investigated by the women's employers or Rochester law enforcement officials." I would broaden the characterization of the public controversy.

The record shows that sexual harassment of Rochester women by male Arabs was a community issue. Area businesses considered harassment of women in Rochester by visiting Arabs a serious concern in the mid–1990s. The Mayo Clinic addressed the problem with "a lot of meetings and a lot of information" and held annual workshops on Arab culture. The Mayo Clinic also generated an internal security report, dated July 19, 1993, documenting the July 18, 1993, alleged sexual assault against Peterson's client, S.M., by a physician associated with the Mayo Clinic that took place at the Radisson. Another local hotel put strict policies into place for dealing with complaints of guests harassing employees. These policies included utilizing interpreters when necessary.

The press reported the allegations of abuse, tolerance, and condonation. The *Rochester Post–Bulletin* published at least seven articles in 1996 related to these concerns, representing the positions of the sexual harassment victims, the Arab community, and the hotel. KSTP launched into an independent investigation of the controversy and reported on incidents of harassment and abuse that took place at various locations in Rochester in its two-part series which focused on the lack of police investigation into the allegations of harassment and abuse and the problems with prosecuting the perpetrators. Some of these news reports mentioned that Arabs visiting Rochester made vital contributions to the local economy.

Therefore, I would conclude that the public controversy was a multi-faceted public controversy stemming from the community's legitimate concern regarding possible condonation of sexual harassment and abuse against women. One facet of the debate was whether the women's allegations were being sufficiently investigated by law enforcement officials. Another was concerned with the hotel's and Chafoulias' response to the women's concern for their physical safety. Yet another aspect had to do with special treatment given to wealthy Arab visitors. In other words, the public questioned whether people in positions of leadership in the community, including Chafoulias, acknowledged and effectively addressed sexual harassment; whether employers, including Chafoulias, knew of employee harassment yet failed to report or investigate; and whether Rochester law enforcement and businesses, including the Radisson, prioritized business gain at the expense of Rochester women.

Not only does the majority characterize the public controversy too narrowly, but the majority also improperly considers Peterson's role in publicizing the public controversy. If a controversy becomes a public controversy *in substance*—and the majority acknowledges that a public controversy exists here—how the controversy becomes a public controversy is unimportant. In other words, the essence of the public controversy issue is not just whether some private controversy has become public due to publicity. Instead, whether

a controversy is a public controversy hinges on the nature or substance of the controversy, i.e., whether "ramifications [of the controversy] will be felt by persons who are not direct participants." *Waldbaum v. Fairchild Publ'ns, Inc.*, 627 F.2d 1287, 1296 (D.C.Cir.1980); *accord Trotter v. Jack Anderson Enters., Inc.*, 818 F.2d 431, 433 (5th Cir.1987); *Lundell Mfg. Co. v. Am. Broad. Cos.*, 98 F.3d 351, 363 (8th Cir.1996); *see also Bruno & Stillman, Inc. v. Globe Newspaper Co.*, 633 F.2d 583, 591 (1st Cir.1980) (requiring that the controversy exist at the time of the alleged defamation). The majority improperly focuses on whether Peterson *publicized* the controversy, which is irrelevant under our precedent.

Thus, I find Chafoulias' argument that Peterson created the public controversy and therefore cannot invoke the public-figure defense to be unavailing. Exposing a controversy or piquing the press's interest in publicizing a controversy—i.e., publicizing a private controversy—is different from creating a public controversy. *Trotter*, 818 F.2d at 434. Indeed, given the definition of "public controversy," it would be impossible for an individual such as Peterson to be responsible for the existence of a public controversy. Moreover, to determine that by sharing news of the public controversy with the press Peterson created the public controversy and therefore conclude that, as to her, Chafoulias is a private figure is tantamount to muzzling those who would be sources for the press. I am quite sure that such a conclusion contradicts the United States Supreme Court's admonition that debate on public issues be "uninhibited, robust, and wide-open." *New York Times Co. v. Sullivan*, 376 U.S. 254, 270, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964).

Because Peterson's alleged role in publicizing the public controversy is not germane to our analysis, whether Peterson contacted the press is irrelevant. I would conclude that whether Peterson initiated contact with the press is of no import to the determination of a public controversy.

Moving on to the second step in the limited purpose public figure inquiry, I agree with the majority that, at this point, the court must examine Chafoulias' role in the public controversy. However, I disagree with the majority that "ABC stands in a different position than Peterson on this issue." I am troubled by this proposition and find no authority to support it.

*Gertz* defined a limited purpose public figure as "an individual [who] voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 351, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). The United States Supreme Court noted that whether one is a limited purpose public figure turns on "the nature and extent of an individual's participation in the particular [public] controversy giving rise to the defamation." *Id.* at 352, 94 S.Ct. 2997. In other words, the determination of limited purpose public figure status hinges on the nature and extent of the *plaintiff's* role in the public controversy, not the defendants'. *Id.* Thus, if Chafoulias is determined to be a limited purpose public figure, he is a limited purpose public figure as to both Peterson and ABC, and I do not understand the majority's remand for "specific findings of fact" in light of their conclusion that, on this record, Chafoulias is a limited purpose public figure as to ABC. As the majority analysis as to ABC shows, the district court did make sufficient fact findings to make a remand inappropriate. Moreover, we give deference to the district court's factual findings under our clearly erroneous standard of review. *See* Minn. R. Civ. P. 52.01 ("Findings of

fact * * * shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses.").

Additionally, I find problematic the majority's suggestion that fact-finding on the issue of limited purpose public figure may be submitted to the jury. This statement is dicta since the majority agrees that the district court may make findings of fact regarding this issue. Nevertheless, I am concerned with the inclusion of this dicta because the majority's proposition—that contested material facts relevant to the limited public purpose inquiry may be put to the jury—contravenes the law.

Whether a defamation plaintiff is a limited purpose public figure is a matter of law for the court to decide. See Rosenblatt v. Baer, 383 U.S. 75, 88, 86 S.Ct. 669, 15 L.Ed.2d 597 (1966); see also Restatement (Second) of Torts § 580A cmt. c (1977) ("The question of whether a plaintiff is a public official or a public figure * * * is one of law, not of fact, though the facts on which the determination is to be made may be in dispute and therefore subject to the determination of the fact finder."). See generally 1 Rodney A. Smolla, Law of Defamation, §§ 2:118, 2:120 (2d ed.2002) (explaining that treating the public figure question as a question of law is wise because of the risk of jury nullification and noting that "there is overwhelming precedent in support of the position that the status of the plaintiff * * * is an issue for the court and not for the jury"). The Rosenblatt court stated that "it is for the trial judge in the first instance to determine whether the proofs show respondent to be a 'public official.'" 383 U.S. at 88, 86 S.Ct. 669. The Court recognized that "[s]uch a course will both lessen the possibility that a jury will use the cloak of a general verdict to punish unpopular ideas or speakers, and assure an appellate court

the record and findings required for review of constitutional decisions." Id. at 88 n. 15, 86 S.Ct. 669. Thus, both the plain language of Rosenblatt and the purpose behind the rule support my conclusion that the determination of the status of a defamation plaintiff is to be decided by the court.

Moreover, the United States Supreme Court applied the Rosenblatt rule to limited purpose public figure analyses—where there were contested issues of fact—in Hutchinson v. Proxmire, 443 U.S. 111, 135–36, 99 S.Ct. 2675, 61 L.Ed.2d 411 (1979) (determining "[o]n this record" that Hutchinson was not a limited purpose public figure), and Wolston v. Reader's Digest Ass'n, Inc., 443 U.S. 157, 167–69, 99 S.Ct. 2701, 61 L.Ed.2d 450 (1979) (concluding from the evidence that Wolston was not a limited purpose public figure). I therefore disagree with the majority's conclusion that Rosenblatt is inapplicable to the instant case. Even if, as the majority concludes, Rosenblatt only applies to situations where material facts are not in dispute, Rosenblatt applies under the circumstances presented here because the district court held an evidentiary hearing to determine the underlying facts before reaching the legal determination of Chafoulias' defamation plaintiff status.

In this case, the district court held a two-day evidentiary hearing on the public figure/private figure issue. Peterson was among those who testified. Chafoulias did not testify. The record before the court included some 500 exhibits. The court attached a memorandum of law, which included fact findings, to its order and noted that the memorandum was "incorporated herein and made a part of this Order." See 2 David F. Herr & Roger S. Haydock, Minnesota Practice–Civil Rules Ann. § 52.1 (1998) ("The findings and conclusions may be made in a separate written

document, may appear in an opinion or memorandum, or may be made orally and recorded in open court."). I conclude that these findings are sufficient for meaningful review. Rather than remand for "specific findings of fact" or additional hearings, I would look to the undisputed facts contained in the record and to the district court's findings, using our clearly erroneous standard of review, to determine whether Chafoulias is a limited purpose public figure.

I would conclude, instead, that the second step of the limited purpose public figure analysis is met: Chafoulias did thrust himself into the public controversy so as to become a factor in its resolution. *See Gertz*, 418 U.S. at 345, 94 S.Ct. 2997. I find Chafoulias' claim—that he neither sought nor desired public attention and that he was "dragged unwillingly" into the limelight—disingenuous. Of course Chafoulias did not desire "bad" publicity, but a defamation plaintiff's desire is not the appropriate measuring stick. Just as defamation defendants cannot create their own defense "by pointing to the attention they have themselves visited upon a plaintiff as evidence that the plaintiff is a public figure,"

> the plaintiff is not permitted to avoid the [limited purpose public figure status] by protesting, "I didn't want the attention." The proper question is not whether the plaintiff volunteered for the publicity but whether the plaintiff volunteered for an activity out of which publicity would foreseeably arise.

Smolla, *supra*, at §§ 2:30, 2:32. In *Marcone v. Penthouse Int'l Magazine for Men*, for example, the court concluded that it was "of no moment that Marcone did not desire such status," because the "purpose of the first amendment would be frustrated if those persons and activities that most require public scrutiny could wrap them-

selves in a veil of secrecy and thus remain beyond the reach of public knowledge." 754 F.2d 1072, 1086 (3d Cir.1985).

Precedent would have us apply the *Gertz* factors to this record to determine whether Chafoulias thrust himself to the forefront of the public controversy so as to achieve a "special prominence" in the debate and become a factor in resolving the controversy. 418 U.S. at 351, 94 S.Ct. 2997. In other words, I would look to the extent to which Chafoulias' participation in the public controversy is voluntary, the extent to which Chafoulias has access to channels of effective communication to counteract false statements, and the prominence of the role Chafoulias played in the public controversy to decide whether Chafoulias "voluntarily inject[ed] himself" or was "drawn into" the public controversy at issue. *Id.*

The record here shows that Chafoulias had access to the media and used the media to promote his position in the dispute. *See Jadwin v. Minneapolis Star & Tribune Co.*, 367 N.W.2d 476, 486 (Minn. 1985) (noting effective media access is "a distinguishing feature" of public figures). In correspondence with KSTP, Chafoulias admitted that the hotel "and other area businesses" had been impacted "by the issues you intend to raise in your story" and admonished KSTP to share the hotel's harassment policy with viewers. The *Post–Bulletin* published an article outlining the Radisson's harassment policy two days after the Radisson issued a press release in response to the harassment charges. The two-part 1998 KTTC interview, though taking place after the alleged defamation, demonstrates that Chafoulias had broad media access allowing him to place media appearances strategically so that he could influence the ultimate outcome of the controversy surrounding the harassment allegations.

Additionally, Chafoulias has, by his own actions, "assumed [a] role[] of especial prominence in the affairs of society" that naturally "invite[s] attention and comment" from the public and the press. *Gertz,* 418 U.S. at 345, 94 S.Ct. 2997; *Waldbaum,* 627 F.2d at 1291–92. By seeking public and government support for his development projects that have a significant impact on Rochester, Chafoulias has assumed a position that invites attention and comment about the manner in which he conducts his business affairs.

Moreover, Chafoulias injected himself into the controversy by actively attempting to influence its outcome. *See Wolston,* 443 U.S. at 164, 99 S.Ct. 2701. The record shows that Chafoulias voluntarily "added his voice to the chorus" discussing the controversy when he wrote the letter to KSTP dated April 26, 1996. *Quantum Electronics Corp. v. Consumers Union of United States, Inc.,* 881 F.Supp. 753, 764 (D.R.I.1995). As of this date, there had been no media reports of the lawsuits against Chafoulias or his hotel. Furthermore, Chafoulias' suggestion to Page—before the airing of "The VIP Floor"—that the focus of ABC's attention should be on Peterson's allegedly unethical legal tactics demonstrates that Chafoulias played a purposeful role in this controversy.

Chafoulias is unlike the plaintiff in *Jacobson v. Rochester Communications Corp.,* 410 N.W.2d 830, 835 (Minn.1987), who "took no other actions" besides defending himself in court and in an interview and who did not seek "any other notoriety." Nor is Chafoulias like the plaintiff in *Wolston,* 443 U.S. at 167, 99 S.Ct. 2701, who *never* discussed with the press his citation for contempt for failure to appear before a grand jury regarding spy charges against his aunt and uncle but "limited his involvement to that necessary to defend himself against the contempt

charge." Rather, Chafoulias communicated with the press and did so, not merely to defend himself, but in a way to influence the outcome of the controversy. Chafoulias' selective refusal of interviews is not credible evidence of his unwillingness to participate in this public controversy. *See Waldbaum,* 627 F.2d at 1295 n. 21.

The district court found that Chafoulias "voluntarily took actions that made him a prominent person in this public controversy," "purposefully used his status and resources to access the media in an attempt to get his position on the Radisson controversy (a part of the broader public controversy) out to the public," and " 'injected himself into the vortex of the controversy' in an attempt to influence its outcome." These findings are substantiated by the record. I would conclude, therefore, that the court of appeals did not err by concluding as a matter of law that Chafoulias was a limited purpose public figure as to both ABC and Peterson.

As to the issue of actual malice, I agree with the majority that summary judgment was appropriately granted as to ABC. I add my analysis as to Peterson because the majority did not reach whether summary judgment was appropriately granted as to her. I conclude that there are no facts before us that would clearly and convincingly support a finding that Peterson acted with actual malice.

For Chafoulias to prevail on this issue, a reasonable jury must be able to conclude that the record establishes, by clear and convincing evidence, that Peterson made her statement with actual malice—in other words, while knowing it was false or "with a high degree of awareness that it was probably false." *Hirman v. Rogers,* 257 N.W.2d 563, 566 (Minn.1977). Chafoulias offers two justifications for his argument that Peterson acted with actual malice when she said "Chafoulias knew. Chafou-

lias has known for years that these women were being attacked, harassed, raped."

Chafoulias first claims that Peterson's ill will toward him supports a finding of actual malice. Actual malice cannot be established "merely through a showing of ill will," however. *Harte–Hanks Communications, Inc. v. Connaughton,* 491 U.S. 657, 666, 109 S.Ct. 2678, 105 L.Ed.2d 562 (1989). Ill will supports a finding of actual malice only where the plaintiff proves "an intent to cause harm *through falsehood.*" *Rose v. Koch,* 278 Minn. 235, 263, 154 N.W.2d 409, 428 (1967); *accord Stuempges v. Parke, Davis & Co.,* 297 N.W.2d 252, 258 (Minn.1980) (noting actual malice "focus[es] on the defendant's attitude toward the truth of what he has said rather than on his attitude toward the plaintiff"). I would conclude that a reasonable jury could not conclude from the record in this case that Peterson intended to cause Chafoulias harm by using information she knew to be false or thought was probably false.

Second, Chafoulias contends that Peterson acted with a reckless disregard for the truth by relying on a known unreliable source in making her allegedly defamatory statement. Specifically, Chafoulias argues that Peterson should have doubted the reliability of federal lawsuit plaintiff D.W. because on a number of occasions, D.W. failed to claim she had told Chafoulias of the attack. *See St. Amant v. Thompson,* 390 U.S. 727, 732, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968) ("[R]ecklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports."). I disagree. The record indicates that D.W. reported the same assault twice: once to her supervisor and manager, and later, to Chafoulias. There is no discrepancy between her statements, and the record does not contain a claim by D.W. that she never told Chafoulias about the assault.

Thus, the record does not demonstrate that Peterson had obvious reasons to doubt D.W.'s veracity. Rather, the record here shows that Peterson conducted an extensive investigation into the allegations made by the hotel's former employees before filing the federal suit. Peterson interviewed both employees and management and attempted to verify allegations. I concur with the district court that Peterson did not doubt the truth of her statement and that the record does not present evidence from which a jury might return a verdict in Chafoulias' favor. Accordingly, I would conclude that the court of appeals properly affirmed the district court's grant of Peterson's, as well as ABC's, summary judgment motion on the actual malice issue.

GILBERT, Justice (dissenting).

I join in the dissent of Justice Russell A. Anderson.

ORDER ON REHEARING

In an opinion filed August 14, 2003, we affirmed in part and reversed in part the decision of the court of appeals and remanded the issue of summary judgment for respondent Lori Peterson based on limited purpose public figure privilege to the district court for further proceedings.

Respondent Peterson has petitioned for rehearing, requesting that any remand first be made to the court of appeals to consider the alternative grounds for summary judgment presented by her to the district court and identified in her notice of review to the court of appeals. Because the court of appeals affirmed the grant of summary judgment in favor of Peterson on the ground of the limited purpose public figure privilege, it did not address Peterson's alternative grounds for summary

judgment. Our reversal of summary judgment with respect to Peterson necessitates consideration of the alternative grounds raised, and accordingly our remand should be to the court of appeals to first address those issues preserved in Peterson's notice of review.

Based upon all the files, records and proceedings herein,

IT IS HEREBY ORDERED the petition for rehearing is granted, and, preliminary to the remand to the district court for determination of the applicability of the limited purpose public figure privilege, we first remand this matter to the court of appeals to determine the issues presented in Peterson's notice of review and briefed by the parties before the court of appeals.

BY THE COURT:

/s/ Sam Hanson
Associate Justice